UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| MARK WEST, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:22-cv-00419-SEB-TAB |
| | ) | |
| TRICIA PRETORIUS Facility Administrator, | ) | |
| CHASSITY PLUMMER Health Service | ) | |
| Administrator, | ) | |
| ALLYSSA Nurse, | ) | |
| JOY Nurse, | ) | |
| ROBERT CARTER, JR. IDOC Commissioner, | ) | |
| STIEN Doctor, Centurion Doctor, | ) | |
| WILKS Dr., | ) | |
| VULULLEH, | ) | |
| CENTURION, | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

Plaintiff Mark West brought this action alleging Defendants violated his constitutional rights when they failed to provide appropriate medical care when his spleen ruptured. Defendants have moved for summary judgment. Dkts. [74], [78]. For the reasons below, those motions are **GRANTED**.

**I.**
**Standard of Review**

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). When reviewing a motion for summary judgment, the Court views the record and draws all reasonable inferences from it in the light most favorable to the nonmoving party. *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 572–73 (7th Cir.

2021). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). A court only has to consider the materials cited by the parties, *see* Fed. R. Civ. P. 56(c)(3); it need not "scour the record" for evidence that might be relevant. *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 573−74 (7th Cir. 2017) (cleaned up).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). "[T]he burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

Whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

In this case, Defendants have met that burden through their unopposed motions for summary judgment. Plaintiff failed to respond to either summary judgment motion.[1] Accordingly, facts alleged in the motions are "admitted without controversy" so long as support for them exists in the record. S.D. Ind. L.R. 56-1(f); *see* S.D. Ind. L.R. 56-1(b) (party opposing judgment must file response brief and identify disputed facts). "Even where a non-movant fails to respond to a

---

[1] Mr. West filed documents on May 11, 2023, at Docket 82; however, the filing consisted entirely of documents previously filed by the defendants and no arguments from Mr. West.

motion for summary judgment, the movant still has to show that summary judgment is proper given the undisputed facts." *Robinson v. Waterman*, 1 F.4th 480, 483 (7th Cir. 2021) (cleaned up).

## II.
## Factual Background

Because Defendants have moved for summary judgment under Rule 56(a), the Court views and recites the evidence in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Khungar*, 985 F.3d at 572–73.

While incarcerated at Plainfield Correctional Facility ("Plainfield") on January 16, 2022, at approximately 1:00 AM, Mr. West felt a sharp pain in his stomach and decided to lay down and sleep. Dkt. 75-1 at 10 (West Deposition). Throughout the night the pain became constant, and around 7:30 AM he began feeling weak and dizzy, with sharper pain and shortness of breath. *Id.* at 10, 13. At that time, another inmate called for assistance. *Id.* at 10. Defendant Sergeant Vululleh and non-party Officer Lowe went to Mr. West's cell. Dkt. 75-1 at 18. While laying down, Mr. West told them he "was having sharp pains in [his] stomach and was short of breath and was dizzy." *Id.* at 19. Sergeant Vululleh directed Mr. West to "get up and get dressed" so they could take him to the medical unit. *Id.* at 18. However, after sitting up, Mr. West stated he was "too weak" to stand up and requested something to drink. *Id.*

Officer Lowe gave Mr. West a water bottle when Sergeant Vululleh stated the cell smelled like smoke and began to search the cell. *Id.* at 11, 18, 47. Mr. West became "a little combative and [a] little angry" at Sergeant Vululleh while he went through his belongings, telling him "you can do that later. I need to see Medical." *Id.* at 22-23. At the same time, Officer Lowe was "definitely focusing on [Mr. West's] needs" by trying to calm him down and "not labor [his] breathing." *Id.* at 24. Once Sergeant Vululleh realized there was a serious medical concern, "he finally stopped searching" and "moved on his own accord" to assist Mr. West. *Id.* at 47-48.

3

Sergeant Vululleh and Officer Lowe attempted to help Mr. West walk, but he was in excruciating pain and lost consciousness multiple times. *Id.* at 11, 20. One of the times he regained consciousness, he saw medical staff had arrived. *Id.* at 11. Someone requested a wheelchair, but it took some time before one was retrieved from the other side of the dorm. *Id.* at 11-22, 46. Once it arrived, he was moved to the medical unit. *Id.* at 12.

When Plaintiff arrived at the medical unit, a nurse immediately evaluated him, laying him on a cot mattress on the floor while she took his vitals and gave him an I.V. *Id.* at 12, 26, 31. After seeing his blood pressure was only 55/33, she called Defendant Dr. Stine. *Id.* at 12, 31. Dr. Stine ordered her to call EMS, who arrived and transported Mr. West to Hendricks Regional Hospital. *Id.* at 12. While there, physicians conducted a CT scan and tested Plaintiff for COVID-19. *Id.* at 33. They determined his spleen had ruptured and he was positive for COVID-19. *Id.* Mr. West was then transferred to St. Vincent Hospital in Indianapolis because Hendricks Regional was not capable of providing the treatment he needed for his spleen. *Id.* At St. Vincent, physicians immediately performed a coil embolism, gave Mr. West a blood transfusion, and treated him for asymptomatic COVID-19. *Id.* at 33, 42, dkt. 79-2 at 2. Approximately six pints of blood entered his stomach due to the ruptured spleen. Dkts. 75-1 at 34-35, 79-2 at 2. The hospital physicians told Plaintiff his body would recycle that blood. Dkt. 75-1 at 35.

Mr. West returned to Plainfield on January 23, 2022. Dkt. 79-2 at 1. He was placed in medical isolation in the infirmary due to COVID-19 restrictions. Dkt. 75-1 at 35. While in the infirmary, the nursing staff only passed by the cells every ten to eleven hours. *Id.* at 36. For the first two days, Mr. West testified he did not receive the prescribed pain management listed on his discharge papers. *Id.* at 38. He believed he was supposed to receive hydrocodone every four to six hours and Tylenol 500. *Id.* at 39. However, his discharge paperwork only states that he was

currently taking those medications at the hospital and to "[p]lease note that we are restricted by law in how many days of narcotic pain medication we can prescribe for you." Dkt. 79-2 at 1-2. It does not state that he should continue to take them, but instead that the hospital "recommend[s] you contact your primary care provider" if a refill is needed. *Id.* at 2.

When Mr. West requested the pain medication, Defendant Nurse Joy told him that he had none on file and, because it was the weekend, Dr. Stine ordered her to give him Tylenol until he could see him on a weekday. Dkt. 75-1 at 40. After Dr. Stine returned to work, he personally went to CVS to pick up Mr. West's pain medication prescription because the facility did not have any on hand. *Id.* at 41. Mr. West was released from the infirmary after ten days. *Id.* at 37.

After he left the infirmary, he continued to have issues with his follow up care. *Id.* at 58-60. His mother called the Indiana Department of Correction ("IDOC") Chief Medical Officer, Dr. Doss, because Mr. West was concerned that his bloodwork wasn't being taken and monitored and his blood pressure was high. *Id.* at 58-59. After she called, Dr. Stine saw Plaintiff and ordered an x-ray, took his blood, treated him for migraines, and prescribed blood pressure medication. *Id.* at 59-60, 63. He also prescribed additional pain medications, including Norco 10, oxycodone, and acetaminophen. *Id.* at 77.

He also saw Dr. Wilks shortly thereafter. *Id.* at 82. At that visit, she denied the oxycodone prescription Dr. Stine had ordered because she did not think it was the proper path to take. *Id.* at 60, 77-78, 82. Because of this, Mr. West never received any of the prescribed oxycodone. *Id.* at 77. Dr. Wilks also told Plaintiff that his stomach pain would taper off over time, but it would take up to approximately ninety days for it to do so. *Id.* at 83.

Additionally, during the relevant time period, Plainfield was not properly following the IDOC COVID-19 policy set forth by the Chief Medical Officer. *Id.* at 57. According to policy,

Mr. West testified that when an inmate was diagnosed with COVID-19, prison staff were supposed to remove the inmate from the cellblock and then clean the dorm. *Id.* at 57. Plainfield did not do this. *Id.* The facility did, however, place Mr. West in medical isolation after his return from the hospital and enact a facility-wide lockdown, which included no inmate movement on the range, having meals brought to inmates rather than in the shared cafeteria, and no day room access. *Id.* at 35, 44.

### III.
### Discussion

The Eighth Amendment's prohibition against cruel and unusual punishment imposes a duty on the states, through the Fourteenth Amendment, "to provide adequate medical care to incarcerated individuals." *Boyce v. Moore*, 314 F.3d 884, 889 (7th Cir. 2002) (citing *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)). "Prison officials can be liable for violating the Eighth Amendment when they display deliberate indifference towards an objectively serious medical need." *Thomas v. Blackard*, 2 F.4th 716, 721–22 (7th Cir. 2021). "Thus, to prevail on a deliberate indifference claim, a plaintiff must show '(1) an objectively serious medical condition to which (2) a state official was deliberately, that is subjectively, indifferent.'" *Johnson v. Dominguez*, 5 F.4th 818, 824 (7th Cir. 2021) (quoting *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016)).

The Court assumes for purposes of the summary judgment motion that Mr. West's ruptured spleen and COVID-19 diagnosis were objectively serious. To avoid summary judgment, then, the record must allow a reasonable jury to conclude that Defendants acted with deliberate indifference—that is, that they consciously disregarded a serious risk to Mr. West's health. *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016). Further, "'[t]o recover damages under § 1983, a plaintiff must establish that a defendant was personally responsible for the deprivation of a

constitutional right.'" *Whitfield v. Spiller*, 76 F.4th 698, 706 (7th Cir. 2023) (quoting *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995)). For this purpose, each defendant is considered independently. *Id.*

### A. Deliberate Indifference

Mr. West's allegations of deliberate indifference against Warden Pretorius and Commissioner Carter relate solely to the implementation of COVID-19 policies at Plainfield. Dkt. 75-1 at 66-67. His allegations against Sergeant Vululleh relate to delaying his access to medical care on January 16, 2022. *Id.* at 64. However, Mr. West has no complaints regarding his medical care that day. *Id.* at 69. All his deliberate indifference claims against medical defendants arise from the care he received after being discharged from St. Vincent Hospital on January 23, 2022, until the date he filed his complaint, March 3, 2022. *Id.*, dkts. 1, 79-2 at 1.

#### a. Non-Medical Defendants

It is a high burden to prove prison officers were deliberately indifferent. "Deliberate indifference is more than mere negligence or carelessness: it is 'something approaching a total unconcern' for inmate safety." *Hunter v. Mueske,* 73 F.4th 561, 566 (7th Cir. 2023) (quoting *Rosario v. Brawn,* 670 F.3d 816, 821 (7th Cir. 2012)); *Huber v. Anderson,* 909 F.3d 201, 208 (7th Cir. 2018) (deliberate indifference "requires more than negligence or even gross negligence; a plaintiff must show that the defendant was essentially criminally reckless, that is, ignored a known risk.") (internal quotation omitted). Failing to choose "the best course of action does not amount to a constitutional violation." *Peate v. McCann,* 294 F.3d 879, 882 (7th Cir. 2002).

#### i. Warden Pretorius

Mr. West alleges Warden Pretorius implemented a time-saving policy regarding COVID-19 that resulted in his contracting the virus. Dkt. 75-1 at 65. His understanding is that, at the time,

the COVID-19 policy required the facility to "hazmat the dorm," clean it, and "properly contain the people that were found positive for COVID[-19]." *Id.* However, the facility "didn't follow the policy." *Id.* at 57.

According to Warden Pretorius, the COVID-19 policy at the time required quarantine units be isolated from other housing units. Dkt. 75-3 at 1. Inmates within the same housing unit were able to use the facilities normally and continue to interact with one another, but inmates who tested positive were moved to the isolation rooms. *Id.* The medical unit would also conduct symptom checks for inmates who remained in their regular housing units. *Id.* Bizarrely, however, Warden Pretorius does not reference cleaning processes or dispute Mr. West's assertion that dorms were not cleaned after known infections. *See id.* Therefore, the Court accepts it as an undisputed fact.

While it is concerning that dorms were not being properly cleaned at the time, there is no designated evidence to support that Mr. West contracted COVID-19 due to any lack of cleaning implemented by Warden Pretorius, rather than some other means. As the nonmoving party, Mr. West receives "the benefit of conflicting evidence and reasonable inferences." *Stockton v. Milwaukee County*, 44 F.4th 605, 614 (7th Cir. 2022). That said, he must "produce evidence sufficient to establish [the] element[s] essential to" his claim. *Id.* Further, "[i]n order to succeed in a § 1983 suit, a plaintiff must establish not only that a state actor violated his constitutional rights, but also that the violation *caused* the plaintiff injury or damages." *Gabb v. Wexford Health Sources, Inc.*, 945 F.3d 1027, 1033 (7th Cir. 2019). Mr. West has failed to demonstrate any of Warden Pretorius' actions caused him to contract COVID-19. Therefore, Warden Pretorius is entitled to summary judgment.

### ii.  Sergeant Vululleh

After being notified by another inmate that Mr. West needed medical attention, Sergeant Vululleh and Officer Lowe arrived at his cell, telling him he needed to get dressed so they could escort him to the medical unit. Dkt. 75-1 at 10, 18. Mr. West repeatedly responded that he was too weak, dizzy, and was cramping in his stomach. *Id.* at 10, 11. Then, Sergeant Vululleh stated he smelled smoke in the cell and began shaking it down, looking for contraband. *Id.* at 11. Mr. West became agitated and argumentative with Sergeant Vululleh because he had not yet called the medical team. *Id.* at 18-19, 23, 32, 47.

However, while Sergeant Vululleh searched the cell, Officer Lowe assisted Mr. West. *Id.* at 24. He gave him water to drink and tried to help him calm his labored breathing. *Id.* Further, once Sergeant Vululleh realized the medical need was serious, he began to assist Mr. West, as well. *Id.* at 47-48. Both officers physically assisted Mr. West in standing up to move him from the cell. *Id.* at 20. They also radioed for a wheelchair. *Id.* at 21.

Mr. West claims Sergeant Vululleh was deliberately indifferent to his medical needs because he searched his room for contraband after Mr. West told him he needed to go to the medical unit. Dkt. 1 at 5. "Non-medical defendants cannot simply ignore an inmate's plight." *Arnett v. Webster,* 658 F.3d 742, 755 (7th Cir. 2011). Where there is an excessive risk to inmate health or safety, "[o]nce an official is alerted of such a risk, the 'refusal or declination to exercise the authority of his or her office may reflect deliberate disregard.'" *Arnett,* 658 F.3d at 756 (quoting *Vance v. Peters,* 97 F.3d 987, 993 (7th Cir. 1996)).

However, Sergeant Vululleh never ignored a known serious medical risk. Mr. West told him that he was having sharp pains and was dizzy, short of breath, and weak. Dkt. 75-1 at 18-19. But he also conceded that he did not know what was going on at that time and that there were no

indicators that he was internally bleeding. *Id.* at 64. Further, Sergeant Vululleh is not a medical professional, and it is undisputed that once he recognized the seriousness of the situation, he and Officer Lowe began assisting Mr. West to leave the cell and go to the medical unit. *Id.* at 48. Responding upon recognizing an emergency is occurring is not "something approaching a total unconcern" for Mr. West's safety. *Rosario,* 670 F.3d at 821; s*ee Perez v. Fenoglio,* 792 F.3d 768, 777 (7th Cir. 2015) ("The deliberate indifference standard reflects a mental state somewhere between the culpability poles of negligence and purpose, and is thus properly equated with reckless disregard."). Nor could a reasonable juror conclude that Sergeant Vululleh's brief search of the room actually delayed Mr. West's treatment when Officer Lowe was assisting him during the search. Accordingly, Sergeant Vululleh is entitled to summary judgment.

### b.  Medical Defendants

Deliberate indifference requires more than negligence or even objective recklessness. *Id*. Rather, Mr. West "must provide evidence that an official actually knew of and disregarded a substantial risk of harm." *Petties*, 836 F.3d at 728. "Of course, medical professionals rarely admit that they deliberately opted against the best course of treatment. So in many cases, deliberate indifference must be inferred from the propriety of their actions." *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 241 (7th Cir. 2021) (internal citations omitted).

The Seventh Circuit has held that deliberate indifference occurs when the defendant:

- renders a treatment decision that departs so substantially "'from accepted professional judgment, practice, or standards as to demonstrate that'" it is not based on judgment at all. *Petties*, 836 F.3d at 729 (quoting *Cole v. Fromm*, 94 F.3d 254, 260 (7th Cir. 1996)).

- refuses "to take instructions from a specialist." *Id.*

- persists "in a course of treatment known to be ineffective." *Id.* at 729–30.

- chooses "an 'easier and less efficacious treatment' without exercising professional judgment." *Id.* at 730 (quoting *Estelle*, 429 U.S. at 104 n.10).

- effects "an inexplicable delay in treatment which serves no penological interest." *Id.*

*Thomas v. Martija*, 991 F.3d 763, 772 (7th Cir. 2021) ("Persisting in treatment known to be ineffective can constitute deliberate medical indifference, provided that the doctor was subjectively aware that the treatment plan was ineffective.").

### i. Dr. Stine

Upon Mr. West's return to Plainfield from St. Vincent Hospital, he complained of extreme pain but initially declined extra strength Tylenol because he did not know what it was. Dkts. 75-1 at 74, 79-1 at 7. After continued complaints that the pain was increasing, Nurse Joy called Dr. Stine, who prescribed Tramadol. Dkts. 75-1 at 77, 79-1 at 13. After taking it, Mr. West reported some comfort and a pain score of two out of ten. Dkts. 75-1 at 77, 79-1 at 5-6. Dr. Stine also prescribed Norco 10 (hydrocodone) and oxycodone[2] for pain relief. Dkts. 75-1 at 77, 79-1 at 8. Mr. West testified that Dr. Stine "actually himself went to CVS to get the prescription [for hydrocodone] on Tuesday because they didn't have none (sic) on hand." Dkt. 75-1 at 41.

However, Mr. West continued to experience pain, so his mother called staff members to inquire about his care. Dkt. 75-1 at 58. The same day Dr. Stine learned that Mr. West's mother had called, he evaluated Mr. West again and "ordered an x-ray, took [his] blood at that point, and he treated [Mr. West] for the migraines [he] was having after the incident." Dkts. 75-1 at 59, 79-1 at 14-17, 79-4. Dr. Stine prescribed Tylenol 3 for pain control of both the migraines and severe cramps Mr. West continued to experience. Dkts. 75-1 at 60, 79-1 at 16.

---

[2] While Dr. Stine prescribed oxycodone and submitted a Formulary Exception Request ("FER") on January 24, 2022, Mr. West did not actually take any because the FER was denied by Dr. Wilks. Dkts. 79-1 at 16, 75-1 at 77.

To demonstrate deliberate indifference, Mr. West must show that Dr. Stine recklessly disregarded his serious medical needs. *Perez,* 792 F.3d at 776. When making this consideration, the Court "look[s] at the totality of an inmate's medical care." *Petties,* 836 F.3d at 728. Deliberate indifference occurred only if Dr. Stine's treatment "was so inadequate that it demonstrated an absence of professional judgment." *Petties*, 836 F.3d at 729. Here, Dr. Stine evaluated Mr. West multiple times, timely responded to phone calls and emails regarding Mr. West's concerns, and changed his treatment plan as needed, once even personally picking up a prescription from the local pharmacy. Dkts 75-1 at 41, 59, 74, 77; 79-1 at 8, 13-17; 79-4. Mr. West has provided "no evidence suggesting that the defendant[] failed to exercise medical judgment or responded inappropriately to [Mr. West's] ailments." *Plummer v. Wexford Health Sources, Inc.,* 609 F. App'x 861, 862 (7th Cir. 2015); *see Harper v. Santos,* 847 F.3d 923, 927 (7th Cir. 2017) (treating doctor's active monitoring of plaintiff's needs "represents the antithesis of deliberate indifference") (internal citations omitted). Accordingly, Dr. Stine is entitled to summary judgment.

### ii.  Dr. Wilks

Mr. West alleges Dr. Wilks was deliberately indifferent to his serious medical needs because she denied the oxycodone prescription Dr. Stine requested without evaluating him herself. Dkt. 75-1 at 87. However, she did evaluate Mr. West approximately two weeks later, on February 9, 2022. Dkts. 75-1 at 88, 79-1 at 18-20. During that visit, she informed him that the pain he was experiencing was from the blood in his stomach and it would naturally taper off, but it could take up to 90 days before it was completely gone. Dkt. 75-1 at 83. Instead of oxycodone, she supported continuing the Tylenol 3 Dr. Stine prescribed for pain relief. Dkts. 75-1 at 83, 79-1 at 20. While

she did not order the CT scan Mr. West wanted, dkt. 1 at 12, she did order some tests. Dkt. 79-1 at 20.

Deliberate indifference "requires more than negligence or even gross negligence; a plaintiff must show that the defendant was essentially criminally reckless, that is, ignored a known risk." *Huber v. Anderson,* 909 F.3d 201, 208 (7th Cir. 2018) (internal quotation omitted). Further, "[d]isagreement between a prisoner and his doctor, or even between two medical professionals, about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation." *Pyles v. Fahim,* 771 F.3d 403, 409 (7th Cir. 2014) (internal citation omitted). Dr. Wilks exercised her professional judgment in denying a stronger narcotic in favor of alternate pain medication, and then conducted a follow up evaluation on Mr. West herself a couple weeks later. Dkts. 75-1 at 77, 79-1 at 20. After determining the evaluation was "unremarkable," she provided Mr. West with an explanation for her decision to maintain the current pain medication and ordered some tests. Dkts. 75-1 at 83, 79-1 at 18, 20.

While she did not order the test or medication he wanted, "the Eighth Amendment does not entitle him to dictate terms of care;" it entitles him to reasonable measures to address a serious medical need. *Williams v. Ellefson,* No. 21-1587, 2022 WL 741736 at *3; *Forbes v. Edgar,* 112 F.3d 262, 267 (7th Cir. 1997); *see Proctor v. Sood,* 863 F.3d 563, 568 (7th Cir. 2017) ("The decision whether further diagnostic testing was necessary… is a classic example of a matter for medical judgment.") (internal citation omitted); *Harper v. Santos,* 847 F.3d. 923, 926-27 (7th Cir. 2017) (affirming grant of summary judgment to physician who discontinued pain medication by hospital physicians following surgery because the physician attempted to manage the prisoner's pain).

Mr. West has failed to demonstrate that Dr. Wilks did not take reasonable measures to address his pain concerns. Dr. Wilks is thus entitled to summary judgment.

### iii. Nurse Alyssa

Mr. West alleges that Nurse Alyssa was deliberately indifferent because she refused to take his vitals when she was already assisting another patient, didn't take him seriously when he asked her to email Dr. Stine, and failed to release his medical records to his mother. Dkts. 1 at 10, 75-1 at 91. However, he has not designated any evidence to support his contention. Mr. West is not entitled to demand a medical professional cease their current evaluation of another patient to check his blood pressure. *See Lindsey v. Sauvey,* 764 F. App'x 555, 556 (7th Cir. 2019) ("[Plaintiff] contends that a jury could find deliberate indifference on [the nurse's] part in refusing him immediate assistance when requested. However, [Plaintiff] does not point to any evidence that the nurse blatantly mistreated him or recklessly disregarded his needs."). Further, Nurse Alyssa did email Dr. Stine regarding continued concerns for Mr. West, marking it as "high" importance and requesting that Dr. Stine "get him seen today and maybe order some labs[.]" Dkt. 79-4. Finally, his allegation that she failed to release his medical records to his mother has no bearing on the medical care he received from prison medical staff. As such, Nurse Alyssa is entitled to summary judgment.

### B. Personal Involvement

"[I]ndividual liability under § 1983 . . . requires personal involvement in the alleged constitutional deprivation." *Colbert v. City of Chicago,* 851 F.3d 649, 657 (7th Cir. 2017) (internal quotation omitted) (citing *Wolf-Lillie v. Sonquist,* 699 F.2d 864, 869 (7th Cir. 1983) ("Section 1983 creates a cause of action based on personal liability and predicated upon fault. An individual cannot be held liable in a § 1983 action unless he caused or participated in an alleged constitutional

14

deprivation.... A causal connection, or an affirmative link, between the misconduct complained of and the official sued is necessary.")).

Whether supervisory personnel at a prison are sufficiently involved in an alleged constitutional violation such that they may be liable for damages often depends on that person's knowledge of, and responsibilities regarding, the alleged harm. Mere "knowledge of a subordinate's misconduct is not enough for liability." *Vance v. Rumsfeld,* 701 F.3d 193, 203 (7th Cir. 2012) (en banc).  Indeed, "inaction following receipt of a complaint about someone else's conduct is [insufficient]." *Estate of Miller by Chassie v. Marberry,* 847 F. 3d 425, 428 (7th Cir. 2017).

### a.  Commissioner Carter

Mr. West makes no allegations regarding Commissioner Carter except that, regarding Plainfield's COVID-19 policy, "he's the commissioner of the [Indiana] DOC, and it's his job to make sure that the [warden] is implementing and doing everything in her job." Dkt. 75-1 at 66-67. He does not allege that Commissioner Carter gave any directions related to COVID-19 policy to anyone at Plainfield or was aware of any alleged misconduct there. *Id.* at 67-68. Because liability under § 1983 requires personal involvement, and Mr. West has not alleged any here, Commissioner Carter is entitled to summary judgment. *See Colbert,* 851 F.3d at 657.

### b.  HSA Plummer

At his deposition, Mr. West stated that his allegations of deliberate indifference as to HSA Plummer were "[t]hat she allowed the medical requests that I was submitting not to be properly addressed." Dkt. 75-1 at 96. He also stated that his understanding of the job duties and responsibilities of an HSA were to "go[] through the healthcare requests and either submit[] them to the doctor or to the nurse practitioner or whoever it is you're supposed to see," and "meet[] with

the grievance specialist to formulate responses to medical grievances," generally serving "like the head nurse." *Id.* at 93. However, Mr. West had earlier conceded that he did not know whether the lack of responses to his medical requests "[d]irectly involved Chassidy Plummer." *Id.* at 95. In fact, there is no evidence in the record that she had any involvement with his medical care, health care requests, or grievances. Therefore, HSA Plummer is entitled to summary judgment on this claim because Mr. West failed to allege any personal involvement.

Further, as to Mr. West's allegations related to HSA Plummer implementing the same time-saving COVID-19 policies as Warden Pretorius, he has similarly failed to demonstrate that any actions by HSA Plummer caused him to contract COVID-19. HSA Plummer is therefore entitled to summary judgment for that claim, as well.

### c.  Policy or Custom

Private corporations acting under color of state law—including those that contract with the state to provide essential services to prisoners—are treated as municipalities for purposes of § 1983 and can be sued when their actions violate the Constitution. *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 235 (7th Cir. 2021) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978)). Thus, in order to maintain a § 1983 claim against Centurion, Mr. West must show that his constitutional rights were violated by a policy or custom of theirs. *Monell*, 436 U.S. at 694−95. "The critical question under *Monell* is whether a policy or custom of a municipal entity caused a constitutional deprivation." *Gonzalez v. McHenry Co., Ill.*, 40 F.4th 824, 829 (7th Cir. 2022). For liability to attach, Mr. West must show that the municipality acted with deliberate indifference. *J.K.J. v. Polk County*, 960 F.3d 367, 377 (7th Cir. 2020).

Under the deliberate indifference standard, Mr. West must show that he was at serious risk of exposure to harm, and Centurion "kn[ew] of a substantial risk of harm to an inmate and either

act[ed] or fail[ed] to act in disregard of that risk." *Donald v. Wexford Health Sources, Inc.,* 982 F.3d 451, 458 (7th Cir. 2020) (cleaned up). To the extent that he is challenging a facially lawful policy (express or implied), Mr. West must provide evidence of a "pattern of similar constitutional violations resulting from the policy." *Helbachs Café LLC v. City of Madison*, 46 F.4th 525, 530 (7th Cir. 2022) (cleaned up). If Mr. West is challenging an unconstitutional municipal practice or custom, he must show "evidence that the identified practice or custom caused multiple injuries." *Id.* (cleaned up).

Mr. West failed to demonstrate either. He has designated no evidence of a policy or custom that caused multiple injuries, nor has he designated evidence of a pattern of similar violations caused from such a policy. Rather, he merely alleges that Centurion is liable because "they're the ones that make sure that all their staff follows the guidelines and policies implemented by their contract." Dkt. 75-1 at 96. However, Centurion "cannot be held liable for damages under 42 U.S.C. § 1983 on a theory of *respondeat superior*." *Simpson v. Brown County*, 860 F.3d 1001, 1005-6 (7th Cir. 2017) (citing *Monell*, 436 U.S. at 690-91). Further, even if it could, Mr. West has failed to demonstrate any Centurion employee violated his constitutional rights. Accordingly, Centurion is entitled to summary judgment.

### d. Qualified Immunity

Because the Court has found as a matter of law that Defendants did not violate Mr. Johnson's constitutional rights, the Court need not address their qualified immunity argument. *Sparing v. Village of Olympia Fields,* 266 F.3d 685, 688 (7th Cir. 2001) (the first step of a qualified immunity determination is whether the plaintiff has shown the violation of an actual constitutional right).

**IV.**
**Conclusion**

Defendants' motions for summary judgment are **GRANTED**. Dkts. [74], [78].

Because the claims against Nurse Joy were not addressed in either motion for summary

judgment, partial final judgment will not enter at this time.

**IT IS SO ORDERED.**

Date:    3/5/2024

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

MARK WEST
191995
WESTVILLE - CF
WESTVILLE CORRECTIONAL FACILITY
Electronic Service Participant – Court Only

All Electronically Registered Counsel